UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

GERMAIN ISMAEL,                          :
                                         :
                          Plaintiff,     :
                                         :
                -against-                :                1:18-cv-3597-GHW
                                         :
                                         :            <u>MEMORANDUM OPINION</u>
C.O. CHARLES, CAPTAIN "JANE"             :                <u>AND ORDER</u>
COMACHO, C.O. CARUSO, C.O. SAMPSON,      :
C.O. "JOHN DOE" 1-2, DEPUTY WARDEN       :
POLITE, and the CITY OF NEW YORK,        :
                                         :
                          Defendants. :
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  7/14/2020

GREGORY H. WOODS, United States District Judge:

      Germain Ismael was wearing a gray jacket—and that was a big problem. Ismael was incarcerated. A corrections officer noticed that Ismael was wearing a jacket that was not part of his prison-issued uniform. That's not allowed. So a group of corrections officers told Ismael that he needed to relinquish the offending jacket. Ismael refused. Defendant Jane Camacho[1] eventually tried to pepper spray Ismael. Ismael ran away, and the officers gave chase. Ismael resisted the officers' attempts to subdue him. So the officers forcefully restrained Ismael. After he was restrained, Ismael says the officers continued to hit and otherwise physically abuse him.

      Ismael sued, alleging the officers used excessive force. Defendants now move for partial summary judgment and to exclude the report and testimony of Ismael's purported expert, Dr. Robert Gluck. Because there are disputes of material fact about whether the officers "slammed" Ismael face first onto a gurney and whether they continued to use force against him after he was restrained, the motion for partial summary judgment is mostly DENIED. But Ismael has

---

[1] Camacho's name is misspelled in the caption of this case.

abandoned his claims against Defendant Polite and there was no clearly established law that Camacho's decision to pepper spray Ismael was unlawful, so the motion is GRANTED in part. Ismael has also carried his burden to show that Gluck used a reliable methodology in preparing his expert report, so Defendants' motion to preclude Gluck's report and testimony is also DENIED.

# I. BACKGROUND

## A. Facts[2]

### 1. The Main Intake Incident

In February 2018, Ismael was incarcerated in the Otis Bantum Correctional Center ("OBCC"). 56.1 Stmt, Dkt No. 65 ¶ 14 (citing Deposition of Germain Ismael ("Ismael Dep."), Ex. B to Affirmation of Nicholas L. Collins ("Collins Aff."), Dkt No. 50-2, at 37:19-25, 38:1-9). At about 11 a.m., Ismael was in a "holding pen," waiting to be taken to court for an "unrelated criminal matter." *Id.* ¶ 15 (citing Ismael Dep. at 38:10-16, 45:25, 46:1-2). Ismael wore a gray jacket—which he had with him when he was taken into custody—underneath his Department of Corrections ("DOC")-issued uniform. *Id.* ¶¶ 16-17 (citing Ismael Dep. at 42:17-25, 43:1-8). DOC forbids inmates from having outside clothing. *Id.* ¶ 18 (citing Departmental Clothing, Department of Correction Operation Order, Ex. J to Collins Aff., Dkt No. 50-10). So DOC staff members, including Defendants, asked Ismael to step out of the holding pen and remove his jacket. *Id.* ¶¶ 19-20 (citing Ismael Dep. at 46:7-12, 48:3-7; Deposition of Marvin Charles ("Charles Dep."), Ex. C to Collins Aff., Dkt No. 50-3, at 29:2-17; Deposition of Aracelis "Jane" Camacho ("Camacho Dep."), Ex. D to Collins Aff., Dkt No. 50-4, at 14:24-25, 15:2-9, 15:13-21, 16:3-20; Deposition of Sean

---

[2] Unless otherwise noted, these facts are undisputed. The Court must "construe[] the evidence in the light most favorable to the non-moving party, and draw all reasonable inferences in [his] favor." *Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003). So when Ismael's and Defendants' renditions of the facts diverge, the Court must accept Ismael's version as true on this motion. Indeed, "choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).

Sampson ("Sampson Dep."), Ex. E to Collins Aff., Dkt No. 50-5, at 26:25, 27:2-25, 28:2-7, 29:8-18; Deposition of John Caruso ("Caruso Dep."), Ex. F to Collins Aff., Dkt No. 50-6, at 62:14-25, 63:2-23. Ismael refused to remove his jacket, even after he was informed that he would not be permitted to proceed to court if he did not remove it. *Id.* ¶¶ 21-22 (citing Ismael Dep. at 49:24-25, 50:1-13).

Just then, an "institutional alarm"—unrelated to the ongoing dispute about Ismael's jacket—sounded. *Id.* ¶ 23 (citing Charles Dep. at 45:24, 46:2-16; Camacho Dep. at 30:17-25, 31:2-17, Sampson Dep. at 32:4-14). Caruso, Charles, and Camacho were on "OBCC's probe team," which was assigned to respond to any institutional alarms. *Id.* ¶ 24 (citing Camacho Dep. at 31:4-12, 77:18-25; Charles Dep. at 46:17-24, 47:2-23; Sampson Dep. at 32:4-14). But before these Defendants could respond to the alarm, they needed to secure Ismael. *Id.* ¶ 25 (citing Charles Dep. at 47:24-25, 48:2-20; Camacho Dep. at 33:11-19). So they escorted Ismael to a different "isolation" holding pen and ordered him to step inside. *Id.* ¶¶ 26-27, (citing Ismael Dep. at 54:5-11; Charles Dep. at 48:21-25, 49:2-12, 49:21-25, 50:2-10; Camacho Dep. at 31:17-25, 32:2-24; Sampson Tr. at 33:2-25, 34:2-5).

Ismael refused. *Id.* ¶ 30 (citing Ismael Dep. at 54:2-25, 55:1-14). Ismael insisted that he would not relinquish his jacket because he was anemic and thus was cold. *Id.* ¶ 31 (citing Ismael Dep. at 55:15-18; Camacho Dep. at 18:4-8). Caruso told Ismael that DOC staff would provide him with more DOC-issued clothing if he was cold. *Id.* ¶ 32 (citing Caruso Dep. at 53:18-20, 56:18-25, 57:1-7). But Ismael continued to refuse to give up his jacket or step into the isolation pen. *Id.* ¶ 33 (citing Ismael Dep. at 55:1-25, 56:1-20). Camacho told Ismael that he would be pepper sprayed if he continued to disregard DOC orders. *Id.* ¶ 34 (citing Camacho Dep. at 35:4-15, Caruso Dep. at 12:4-9, 66:18-23, Charles Dep. at 51:11-21). Ismael wouldn't obey.

So Camacho pepper sprayed Ismael. *Id.* ¶ 35 (citing Ismael Dep. at 56:21-23, 57:23-24, 58:5-19; Caruso Dep. at 12:10-25, 13:2, 14:10-12, Charles Dep. at 51:11-21, Sampson Dep. at 17:24).

Ismael turned and began to run as he was sprayed. *Id.* Several officers chased him. *Id.* ¶ 36 (citing Ismael Dep. at 58:23-25, Caruso Dep. at 17:16-20). A struggle between Ismael and the officers ensued. *Id.* ¶ 37 (citing Charles Dep. at 53:5-13, 54:2-13, 55:22-25, 56:2-23, 57:13-25; Sampson Dep. at 44:8-14; Caruso Dep. at 69:11-25, 70:2-25). Ismael and several officers ended up on the ground. *Id.* ¶ 38 (citing Sampson Tr. at 46:14-15, Caruso Dep. at 20:4-16, Charles Dep. at 64:14-19). Ismael claims that he was thrown to the ground by one of the officers. *Id.* at 6 (citing Transcript of Germain Ismael's 50-H Hearing ("50-H Tr."),[3] Ex. B to Declaration of Alan D. Levine ("Levine Decl."), at 46:11-15).

The struggle between Ismael and the officers continued on the ground. *Id.* ¶ 39 (citing Ismael Dep. at 63:8-10; Charles Dep. at 63:11-25, 64:2-19, 65:4-14; Sampson Dep. at 52:24-25, 53:2-25). Ismael claims that the officers "punched, kicked, [and] bent . . . his hands" at the wrist while he was on the ground. *Id.* at 7 (citing 50-H Tr. at 46:20-48:7; Ismael Dep. at 58:23-64:9). Ismael testified that after a while, Camacho said "that's enough." Ismael Dep. at 63:22-25. The officers then put Ismael onto a gurney. *Id.* ¶ 40 (citing Ismael Dep. at 64:10-11, 65:7-24). Ismael says that he was "slammed" onto the gurney face first. *Id.* at 7 (citing Ismael Dep. at 64:25-65:10). These events occurred in the "main intake" area of the OBCC, so the Court refers to this as the "Main Intake Incident."

The officers who subdued Ismael also sustained injuries. Charles and Caruso suffered scratches on their faces. *Id.* ¶¶ 48-49 (citing Charles Dep. at 61:23-25, 62:2-7; Caruso Dep. at 45:7-

---

[3] "A '50-h hearing' is an examination provided for under New York General Municipal Law § 50-h." *Rembert v. City of New York*, No. 16-cv-5586 (ARR) (CLP), 2019 WL 5742591, at *5 n.4 (E.D.N.Y. Nov. 5, 2019) (citation omitted); *see also* N.Y. Gen. Mun. Law § 50-h(1) ("Wherever a notice of claim is filed against a . . . city . . . the . . . city . . . shall have the right to demand an examination of the claimant relative to the occurrence and extent of the injuries or damages for which claim is made, which examination shall be upon oral questions unless the parties otherwise stipulate[.]"). "A plaintiff's testimony in a 50-h hearing may be considered by the Court on a motion for summary judgment." *Rembert*, 2019 WL 5742591, at *5 n.4 (collecting cases).

25, 46:2-12).  Caruso also testified that he tore his rotator cuff.  *Id.* ¶ 51 (citing Caruso Dep. at 41:25, 42:2-22, 43:17-23).  Non-party officer Allison Jean Bart attests that Ismael bit her on the wrist.  *Id.* ¶ 50 (citing Affidavit of Allison Jean Bart, Ex. H to Collins Aff., Dkt No. 50-8, ¶ 6).

There is video footage of the Main Intake Incident.  The footage was captured by a camera held by an officer and by the facility's surveillance cameras.  The videos show that Ismael failed to respond to direct orders to remove his gray jacket.  As Ismael and DOC staff argued about the jacket, an alarm sounded.  The officers then escorted Ismael to an isolation pen.  Ismael refused to enter.  Camacho announced that she would pepper spray Ismael if he failed to cooperate.  At this point, the officer wielding the handheld camera stopped filming.  So the moment at which Camacho sprays Ismael was not recorded.  But the facility's surveillance cameras recorded Ismael running away from a group of corrections officers.  The staff chased Ismael and tried to restrain him.  Ismael resisted.  The officers tackled Ismael.  They then piled on top of Ismael to subdue him.  Ismael is on the ground for about five minutes.

It is impossible to tell from the video whether the officers in fact punched and kicked Ismael and bent his hands at the wrist.  The surveillance video also does not have sound, so we cannot hear what Ismael or DOC staff are saying.  From the video, however, we can see that Camacho speaks to the corrections officers.  So the video is not clearly inconsistent with Ismael's testimony that officers physically abused him until Camacho told them "that's enough."

## 2. The Clinic Incident

With Ismael secured on the gurney, the corrections officers took him to the OBCC clinic. Before the officers took him there, though, Ismael heard a Defendant say that they should take Ismael there because there are no cameras in the clinic.  Counter 56.1 Statement ("Counter 56.1 Stmt"), Dkt No. 68, ¶ 64 (citing Ismael Dep. at 74:3-7).  There were indeed no cameras in the clinic.

So there is no video evidence of what occurred after the officers wheeled Ismael into the clinic on the gurney.  Ismael testified that Sampson, Charles, and Caruso continued to beat Ismael after they wheeled him into the clinic.  *Id.* ¶ 60 (citing 50-H Tr., 45:16-18; Ismael Dep. at 59:7-64:9).  Ismael also testified that these same Defendants "bent his finger and squeezed his handcuffs" while he was in the clinic.  *Id.* ¶ 65 (citing Ismael Dep. at 69:15-74:16).  Sampson, Charles, and Caruso denied doing so.  *Id.* at 3 (citing Charles Dep. at 70:19-25, 71:2-25, 72:2-17; Caruso Dep. at 86:14-25, 87:2-25, 88:2; Sampson Dep. at 62:18-25, 63:2-20).  Because this incident occurred in the OBCC clinic, this opinion calls it the "Clinic Incident."

### 3. Ismael's Injuries

After Ismael was removed from the clinic, he was placed in a decontamination shower stall to counteract the lingering effects of the pepper spray.  *Id.* ¶ 69 (citing Ismael Dep. at 74:25-79:17).  He was left alone in the shower stall for several hours.  *Id.*  He received medical treatment at about 7 p.m.  *Id.* ¶ 71 (citation omitted).

Ismael testified that he sustained injuries to his eyes, ears, mouth, and back.  Ismael Dep. at 82:10-13.  Ismael fractured a bone near his eye.  *Id.* at 84:6-8.  He also "couldn't see" because his eyes were swollen shut.  *Id.*  He had a "swollen lip."  *Id.* at 85:1-11.  And he complained about ringing in his ears.  *Id.* at 89:20-25.  Ismael also suffered a lower back injury that continues to bother him.  *Id.* at 87:14-20.

Ismael had significant injuries to his hands and wrists.  His hands were swollen just after the incident.  *Id.* at 88:14-19.  He testified that he "couldn't make a fist" and "couldn't feel [his] hand" for at least a month.  *Id.* at 91:23-92:3.  Ismael could still "barely make a fist" because of his hand injuries at his deposition.  *Id.* at 102:14-16.  He was released from prison about a month after his altercation with the officers.  *Id.* at 100:14-18.  After he was released, Ismael sought and received

treatment for his injuries at Brookdale Medical Center in Brooklyn, New York.  Counter 56.1 Stmt ¶ 73 (citation omitted).  He saw a hand specialist named Dr. Finland, who gave a splint for his hand and arm.  Ismael Dep. at 92:4-93-6.  Dr. Finland also recommended that he do physical therapy for his wrist injury.  *Id.* at 93:7-8.  Ismael testified that he received treatment for his wrist injury for a year and a half after the incident.  *Id.* at 102:19-22.

Ismael also suffered emotional injuries.  He began to suffer from insomnia after the altercation.  *Id.* at 103:1:11.  And he has "flashbacks" in which he "see[s]" the officers "beating" him "every day."  *Id.* at 104:15-24.  Ismael also became depressed.  *Id.* at 105:18-106:8.

### B. Procedural History

Ismael's complaint raises two claims.  Dkt No. 1.  First, Ismael alleges that Defendants Charles, Camacho, Caruso, Sampson, Polite, and John Does 1-2 used excessive force against him in contravention of 42 U.S.C. § 1983 ("Section 1983").  *Id.* ¶¶ 19-53.  Second, Ismael alleges that Defendants Charles, Camacho, Caruso, and Sampson battered him in violation of New York law. *Id.* ¶¶ 54-59.

Defendants now move for partial summary judgment and to preclude the testimony and report of Dr. Robert Gluck.  Dkt Nos. 49-55.  Defendants acknowledge that there is an issue of fact whether some Defendants used excessive force during the Clinic Incident.  But they move for partial summary judgment on Ismael's claims to the extent they are based on the Main Intake Incident. Defendants attached Dr. Gluck's report to an attorney affirmation.  *See* Gluck Report, Dkt No. 54-1. Ismael opposed both motions, Dkt Nos. 62-65, and Defendants replied, Dkt Nos. 68-70.

## II. MOTION FOR PARTIAL SUMMARY JUDGMENT

### A. Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))).  The movant must "identify[] each claim or defense—or the part of each claim or defense—on which" it seeks summary judgment.  Fed. R. Civ. P. 56(a).  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party[,]" and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary" do not preclude summary judgment. *Id.*

The movant bears the initial burden of showing "the absence of a genuine issue of material fact." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323).  If the movant carries that burden, the burden shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Id.*  To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)) (emphasis omitted).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.  And the non-movant "must do more than simply show

that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The non-movant "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quotation omitted).

On a motion for summary judgment, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson*, 680 F.3d at 236 (quotation omitted). The court cannot "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted).

### B. Application

#### 1. Claims Against Polite

Defendants are entitled to summary judgment on all claims against Polite. Ismael presented no evidence against Polite. And in his opposition, Ismael conceded that he "ha[d] no objection" to the Court "dismiss[ing]" those claims. Opposition to Summary Judgment ("Opp."), Dkt No. 63, at 3 n.1. The claims against Polite have thus been abandoned and the Court grants summary judgment on Ismael's claims against Polite.

#### 2. Claims Against Sampson, Caruso, and Charles

##### a. Liability

###### i. Legal Standard

Ismael asserts two claims, the first for excessive force under Section 1983 and the second for battery under New York law. "Section 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (citations omitted). "To prevail on a claim under Section 1983, a plaintiff must show that the defendant 'acted under color of state law and . . . deprived him of a right secured by the Constitution

or laws of the United States.'" *Knight v. City of New York*, No. 1:19-cv-4022 (GHW), 2020 WL 2115411, at *5 (S.D.N.Y. May 1, 2020) (quoting *Palmieri v. Lynch*, 392 F.3d 73, 78 (2d Cir. 2004). "'[E]xcept for § 1983's requirement that the tort be committed under color of state law, the essential elements of' a § 1983 excessive force claim and a state law assault and battery claim" under New York law are "'substantially identical.'" *McKenzie v. City of New York*, No. 17-cv-4899 (PAE), 2019 WL 3288267, at *9 (S.D.N.Y. July 22, 2019) (quoting *Posr v. Doherty*, 944 F.2d 91, 94-95 (2d Cir. 1991)); *see also Humphrey v. Landers*, 344 F. App'x 686, 688 (2d Cir. 2009) (quoting *Posr*, 944 F.2d at 94-95).

"Analysis of a claim for use of excessive force begins with 'identification of the specific constitutional right allegedly infringed by the challenged application of force.'" *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)) (brackets omitted). For "a claim by a prisoner that he was subjected to excessive force by prison employees, the source of the ban against such force is the Eighth Amendment's ban on cruel and unusual punishments." *Id.*; *see also* U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."). A "prisoner's claim must 'be judged by reference to this specific constitutional standard, rather than to some generalized 'excessive force' standard.'" *Wright*, 554 F.3d at 268 (quoting *Graham*, 490 U.S. at 394) (alterations omitted).

"[T]he Eighth Amendment is offended by conduct that is 'repugnant to the conscience of mankind.'" *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992)). "Actions are repugnant to the conscience of mankind if they are 'incompatible with evolving standards of decency' or involve 'the unnecessary and wanton infliction of pain.'" *Id.* (quoting *Hudson*, 503 U.S. at 9-10). "[N]ot 'every malevolent touch by a prison guard gives rise to a federal cause of action[.]'" *Id.* (quoting *Hudson*, 503 U.S. at 9-10). But "inmates have the right to be

free from the unnecessary and wanton infliction of pain at the hands of prison officials." *Randolph v. Griffin,* No. 19-434 (PR), 2020 WL 2846649, at *2 (2d Cir. June 2, 2020) (summary order) (quoting *Romano v. Howarth,* 998 F.2d 101, 104 (2d Cir. 1993)).

"A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright,* 554 F.3d at 268 (citing *Hudson,* 503 U.S. at 7-8; *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir. 1999)).

"The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by 'wantonness'" given the "circumstances surrounding the challenged conduct." *Id.* (quotation omitted); *see also Harris v. Miller,* 818 F.3d 49, 63 (2d Cir. 2016) (per curiam); *Randolph,* 2020 WL 2846649, at *2. "When prison officials are accused of using excessive force, the 'wantonness' issue turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 7).

> To determine whether defendants acted maliciously or wantonly, a court must examine several factors including: the extent of the injury and the mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.

*Harris,* 818 F.3d at 63 (quotation omitted).

"The objective component of a claim of cruel and unusual punishment focuses on the harm done, in light of 'contemporary standards of decency.'" *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8). "Analysis of the objective prong is 'context specific' and depends upon the claim at issue[.]'" *Crawford,* 796 F.3d at 256 (first quoting *Hogan v. Fischer,* 738 F.3d 509, 515 (2d Cir. 2013)

and then quoting *Hudson*, 503 U.S. at 8); *see also Harris*, 818 F.3d at 64 ("[D]etermining whether officers used *excessive* force necessarily turns on the need for the force used.").

To "assess[] this component, the court must ask whether 'the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation.'" *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 8); *see also Crawford*, 796 F.3d at 256 (holding that a prisoner must establish "the conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions" (quoting *Hudson*, 503 U.S. at 8, 20)); *Randolph*, 2020 WL 2846649, at *2. So "the Eighth Amendment's prohibition against cruel and unusual punishment does not extend to '*de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.'" *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 10). Indeed, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Id.* (quoting *Hudson*, 503 U.S. at 9).

"But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated[,]'" even if the prisoner does not sustain a "'significant injury[.]'" *Id.* at 268-69 (quoting *Hudson*, 503 U.S. at 9). It therefore follows that "certain actions, including the malicious use of force to cause harm, constitute Eighth Amendment violations *per se*." *Harris*, 818 F.3d at 64 (quotation omitted). The objective component "is satisfied in the excessive force context even if the victim does not suffer serious, or significant injury, as long as the amount of force used is not *de minimis*." *Id.* (quotation omitted). In sum, when "a prisoner's allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically," summary judgment is inappropriate. *Wright*, 554 F.3d at 269. And that is so "even whe[n] the plaintiff's evidence of injury [is] slight and the proof of excessive force [is] weak." *Id.* at 269 (citations omitted).

Judge Carter has observed that "granting summary judgment against plaintiffs on excessive force claims is rarely appropriate." *Anderson v. City of New York*, No. 1:16-cv-02583 (ALC), 2019 WL 1426723, at *8 (S.D.N.Y. Mar. 28, 2019) (citing *Amnesty America v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004)).  That is unsurprising because whether a "use of force was" justified is a "fact intensive inquiry" that often must be "left for a jury to decide." *Olutosin v. Lee*, No. 14-cv-685 (NSR), 2016 WL 2899275, at *9 (S.D.N.Y. May 16, 2016) (quoting *Landy v. Irizarry*, 884 F. Supp. 788, 797 (S.D.N.Y. 1995) (collecting cases)).  And as noted, "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Anderson*, 2019 WL 1426723, at *8 (quoting *Rule*, 85 F.3d at 1011).  For those reasons, "[c]ourts are hesitant 'to dismiss complaints alleging excessive force even at the summary judgment stage if conflicts exist in the record regarding the degree and justification of force.'" *Id.* (quoting *Atkins v. County of Orange*, 372 F. Supp. 2d 377 (S.D.N.Y. 2005)); *see also Jeanty v. Cty. of Orange*, 379 F. Supp. 2d 533, 541 (S.D.N.Y. 2005) (quoting *Evering v. Rielly*, No. 98-cv-6718 (DB), 2001 WL 1150318, at *7 (S.D.N.Y. Sept. 28, 2001) (collecting cases)).

### ii. Application

The Court declines to grant summary judgment on the claims against Sampson, Caruso, and Charles.  Defendants move for summary judgment on claims against those defendants based on the Main Intake Incident.  Even if Defendants are correct the Court should analyze the officers' use of force during the Main Intake Incident separately from the use of force during the Clinic Incident, Ismael has presented sufficient evidence to preclude summary judgment on either claim against Sampson.

13

As to the objective prong, Ismael testified that Sampson was part of a group that "slammed" him face first onto a gurney after he was restrained.  Ismael Dep. at 64:25-65:6.[4]  There is an issue of fact about whether Sampson did so maliciously and sadistically.  That is enough to preclude summary judgment on Ismael's claims against Sampson.[5]

Granted, Ismael refused to comply with direct orders from officers to relinquish his unauthorized article of clothing and to step into the holding pen.  That refusal may have justified the use of some amount of force.  It is also true that some Defendants and other officers testified that they sustained injuries during their tussle with Ismael.  Those injuries also suggest that the officers may have been justified in using force to subdue Ismael.

But Ismael testified that he was beaten and slammed onto the gurney only after he was restrained by handcuffs and leg shackles.  *See id.* at 64:10-65:20; *see also* 50-H Tr. at 48:8-10.  Based on that testimony, a rational factfinder could conclude that Ismael did not present an ongoing threat and thus the force the officers used was excessive.  *Cf. Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999) ("[D]ismissal of the excessive force claim was inappropriate because there are genuine issues of material fact concerning what transpired *after appellant was handcuffed* and whether the guards maliciously used force against him[.]" (emphasis added)).

Ismael has also adduced sufficient evidence to create a genuine issue of fact about whether the use of force was more than *de minimis*.  The injuries Ismael claims to have sustained are adequate to preclude the conclusion, on this motion, that Sampson's use of force in slamming him into the

---

[4] One of the surveillance cameras in the main intake area captured the Main Intake Incident.  The Court cannot tell from the video, however, whether the officers punched Ismael and "slammed" him onto the gurney after he was restrained. The Court must therefore accept Ismael's characterization that he was slammed onto the gurney for this motion.

[5] There is also an issue of fact about whether Sampson failed to intervene as Caruso and Charles beat Ismael.  As explained further below, "[p]rison officials can be held liable under 42 U.S.C. § 1983 for failing to intervene in a situation where another official is violating an inmate's constitutional rights, including the use of excessive force, in their presence."  *Randolph*, 2020 WL 2846649, at *2 (citing *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001)).

gurney was *de minimis*.  Ismael testified that he sustained injuries to his eyes, head, ears, back, and knee.  Ismael Dep. at 82:10-13.  He testified that he "couldn't see" because his eyes were swollen shut and that his "mouth was busted."  *Id.* at 85:1-11.  And he testified that he fractured a bone near his eye, among other injuries.  *Id.* at 84:6-8.  These injuries are more than adequate to preclude the conclusion that the officers' use of force was *de minimis*.  *See, e.g.*, *Griffin*, 193 F.3d at 91 (holding that a district court erred in granting summary judgment on an Eighth Amendment claim even when the "only evidence" of a plaintiff's injuries was his "own testimony" that he suffered "a bruised shin and swelling over his left knee").  A reasonable jury could conclude that Sampson's decision to slam him onto the gurney face first contributed to these injuries.  So drawing all reasonable inferences in favor of Ismael, he has satisfied the objective prong of his Eighth Amendment claim.

Ismael has also presented enough evidence to create a genuine dispute about whether Sampson acted wantonly by slamming him onto the gurney.  Ismael's testimony that he was slammed onto the gurney after being shackled creates a genuine issue of material fact as to whether Sampson acted in "good-faith" to "maintain or restore discipline, or maliciously and sadistically to cause harm."  *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 7).  And because that is so, the Court cannot grant summary judgment on Ismael's claim against Sampson.

The same is true of Caruso and Charles.  Ismael testified that both men participated in slamming him onto the gurney.  And Ismael also testified that they punched him in the face and bent his hands at the wrists after he was restrained.  *See* 50-H Tr. at 45:15-52:18; Ismael Dep. at 59:7-64:9.  These assertions are more than adequate to withstand Defendants' motion for summary judgment on Ismael's claims against Caruso and Charles.

To be sure, there is evidence in the record that supports Defendants' version of events.  The video evidence, in particular, could be interpreted to support the officers' claim that they acted in

good faith.  But time and again, the Second Circuit has held that when "a prisoner's allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically," a district court cannot grant summary judgment "even whe[n] the plaintiff's evidence of injury [is] slight and the proof of excessive force [is] weak." *Harris*, 818 F.3d at 65 (quotation omitted); *see also Wright*, 554 F.3d at 269 (citing *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003); *Griffin*, 193 F.3d at 91); *Randolph*, 2020 WL 2846649, at *2.  Ismael has raised a genuine issue of fact about whether Sampson, Caruso, and Charlies used force maliciously and sadistically by slamming him onto the gurney after he had been restrained.

### b. Qualified Immunity

#### i. Legal Standard

Sampson, Caruso, and Charles are not entitled to qualified immunity.  Qualified immunity is a judge-made doctrine, created to address "the danger that fear of being sued will 'dampen the ardor of all but the most resolute, or the most irresponsible public officials, in the unflinching discharge of their duties.'" *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982) (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (Hand, C.J.)) (brackets omitted).  It "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow*, 457 U.S. at 818).  The doctrine thus "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

"[T]he familiar standards that govern resolution of motions for summary judgment apply equally to such motions based on an assertion of qualified immunity." *Sloley v. Vanbramer*, 945 F.3d

30, 36 (2d Cir. 2019) (citing *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014)).  Courts "evaluate claims of qualified immunity at summary judgment using a two-part inquiry:  (1) 'whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right' and (2) 'whether the right in question was clearly established at the time of the violation.'"  *Id.* (quoting *Tolan*, 572 U.S. at 656).[6]  "Courts have discretion in deciding the order in which to analyze the two prongs but under either, they 'may not resolve genuine disputes of material fact."  *Id.* (quoting *Tolan*, 572 U.S. at 656 and citing *Pearson*, 555 U.S. at 236).

"'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful."  *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quotation omitted).  "[E]xisting law must have placed the constitutionality of the officer's conduct beyond debate."  *Id.* (quotation omitted).  "This demanding standard protects all but the plainly incompetent or those who knowingly violate the law."  *Id.* (quotation omitted).  The Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced."  *Id.* at 590 (quotation omitted).

---

[6] "[S]tate law governs a defendant's entitlement to qualified immunity with respect to state-law claims[.]"  *Napolitano v. Flynn*, 949 F.2d 617, 621 (2d Cir. 1991) (citation omitted).  So New York law determines Defendants' entitlement to qualified immunity on Ismael's battery claim.  "New York [l]aw grants government officials qualified immunity on state-law claims except whe[n] the officials' actions are undertaken in bad faith or without a reasonable basis." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 158 n.4 (2d Cir. 2013) (quoting *Papineau v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006)).  "[T]he New York standard for entitlement to qualified immunity has both objective and subjective components.  The objective component distinguishes between official acts that are 'discretionary' and those that are 'ministerial[.]'"  *Lore v. City of Syracuse*, 670 F.3d 127, 166 (2d Cir. 2012).  Immunity is "available only" for "discretionary" actions.  *Id.* (citing *Mon v. New York*, 78 N.Y.2d 309, 313 (1991)).  "The subjective component makes qualified immunity entirely unavailable if there are 'undisturbed findings of bad faith.'"  *Id.* (quoting *Della Pietra v. New York*, 71 N.Y.2d 792, 795 (1988)).  The difference between the federal and state law standards does not affect the Court's analysis in this case.

Qualified immunity protects an officer so long as "it was objectively reasonable for the officer to believe the conduct at issue was lawful." *Mudge v. Zugalla*, 939 F.3d 72, 79 (2d Cir. 2019) (quotation omitted).  "An officer is entitled to qualified immunity if *any* reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, *could have* determined that the challenged action was lawful." *Muschette v. Gionfriddo*, 910 F.3d 65, 70 (2d Cir. 2018) (quotation omitted).

### ii. Application

Sampson, Caruso, and Charles are not entitled to qualified immunity on this motion.  The Court has already determined that, taking the facts in the light most favorable to Ismael, he has established adequate evidence to preclude summary judgment on his claim for violating his Eighth Amendment rights.  So the first prong of the qualified immunity inquiry is satisfied.  Ismael has also adduced adequate evidence that Sampson, Caruso, and Charles violated his clearly established rights. It is clearly established that prison officials violate the Eighth Amendment when they "use force to cause harm maliciously and sadistically[.]" *Wright*, 554 F.3d at 269.  Indeed, the infliction of malicious and sadistic force is a *per se* violation of the Eighth Amendment.  *See Harris*, 818 F.3d at 64. And as explained, there is an issue of fact about whether Sampson, Caruso, and Charles acted maliciously and sadistically.  For this motion, that is sufficient for Ismael to defeat these Defendants' qualified immunity defense.

The inquiry into whether Sampson, Caruso, and Charles acted maliciously and sadistically is subjective.  "[S]ubjective motive plays no part in the qualified immunity inquiry." *Nagle v. Marron*, 663 F.3d 100, 115 n.13 (2d Cir. 2011).  And when a "specific intent is actually an element of the plaintiff's claim as defined by clearly established law, it can never be objectively reasonable for a government official to act with the intent that is prohibited by law." *Locurto v. Safir*, 264 F.3d 154,

169 (2d Cir. 2001) (citation omitted).  So "a plaintiff need only show particularized evidence of direct or circumstantial facts supporting his claim of unconstitutional motive in order to survive a motion for summary judgment on the defense of qualified immunity."  *Id.* at 170 (quotations omitted).

Ismael has met that burden because he has shown facts adequate to raise a dispute about whether Sampson, Caruso, and Charles acted maliciously or sadistically.  And there are disputed issues of fact about what took place during the Main Intake Incident.  Ismael testified that the officers punched him and bent his hands at the wrist after he was restrained.  Ismael also testified that the officers slammed him onto the gurney with excessive force.  If true, that is circumstantial evidence that supports Ismael's claim that the officers acted maliciously and sadistically.  That is enough to preclude the officers' qualified immunity defense.

At bottom, this case reflects the principle that "granting summary judgment against plaintiffs on excessive force claims is rarely appropriate."  *Anderson*, 2019 WL 1426723, at *8 (citation omitted).  As in many—perhaps most—excessive force cases, questions of fact pervade the record on this motion.  And those questions must be resolved by the jury.[7]

### 3. Claims Against Camacho

Camacho is entitled to qualified immunity for her use of pepper spray but is not entitled to qualified immunity on Ismael's failure to intervene theory of liability on his Section 1983 claim. There are two issues as to Camacho on this motion.  First, Camacho pepper sprayed Ismael in the

---

[7] Defendants' only argument that the City is entitled to summary judgment on Ismael's *respondeat superior* battery claim based on the Main Intake Incident is that summary judgment on "underlying theories of liability eliminate[s] the prospect of" *respondeat superior* liability.  *Harsco Corp. v. Segui*, 91 F.3d 337, 339 (2d Cir. 1996); *see also Conte v. Cty. of Nassau*, 596 F. App'x 1, 3 (2d Cir. 2014).  The Court has rejected Defendants' argument that the Sampson, Caruso, and Charles are entitled to summary judgment on Ismael's Section 1983 claims, so the Court likewise denies summary judgment to the City of New York on Ismael's battery claim.

main intake area.  And second, Camacho purportedly failed to intervene as Defendants subdued

Ismael.

### a. Pepper Spray

To the extent that Ismael seeks to assert an excessive force claim against Defendants based

on Camacho's use of pepper spray, Defendants are entitled to summary judgment on that claim.  To

begin with, it is not clear that Ismael's complaint asserts a claim based on Camacho's use of pepper

spray.  Ismael also failed to argue that Camacho's use of pepper spray constituted excessive force in

his opposition.  The claim is thus abandoned.  *See Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir.

2014) ("Generally, but perhaps not always, a partial response reflects a decision by a party's attorney

to pursue some claims or defenses and to abandon others. . . .  Where abandonment by a counseled

party is not explicit but such an inference may be fairly drawn from the papers and circumstances

viewed as a whole, district courts may conclude that abandonment was intended.").

Even if Ismael had not abandoned a claim based on Camacho's use of pepper spray,

Camacho would be entitled to qualified immunity based on her use of pepper spray against Ismael.

That is because it is not clearly established that pepper spraying an uncooperative inmate is unlawful.

It is clearly established that pepper spraying a restrained or cooperative person is excessive.  *Tracy v.*

*Freshwater*, 623 F.3d 90, 98-99 & n.5 (2d Cir. 2010) ("[I]t [is] well established . . . that the use of

entirely gratuitous force is unreasonable and therefore excessive, . . . [so] no reasonable officer could

have believed that he was entitled to use pepper spray gratuitously against a restrained and

unresisting arrestee" (citations omitted)); *see also Hogan*, 738 F.3d at 515-16.

But there is no clearly established law on when it is appropriate to pepper spray an

uncooperative inmate.  Granted, there is some authority for the proposition that, so long as an

inmate is not physically resisting or otherwise physically threatening prison officials, the use of

pepper spray is excessive.  *See Wiggan v. N.Y.C. Dep't of Corr.*, No. 12-cv-1405 (GBD) (HBP), 2014 U.S. Dist. LEXIS 117635, at *18-26 (S.D.N.Y. Aug. 21, 2014) (collecting cases and noting that "for the most part, the cases seem to turn on whether the pepper spray or similar substance was used in order to cause an inmate to cease engaging in dangerous or disruptive conduct").  Most of that authority, however, comes from district courts.  "To determine whether the relevant law was clearly established, we consider the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law."  *Muschette*, 910 F.3d at 70 (quotation omitted).  That inquiry "generally entails looking to Supreme Court decisions, [Second Circuit] decisions, and decisions from other circuit courts."  *Mudge*, 939 F.3d at 79 (quotation omitted).  "When neither the Supreme Court nor [the Second Circuit] has recognized a right[,] the holdings of district courts cannot act to render that right clearly established within the Second Circuit."  *Id.* (quoting *Pabon v. Wright*, 459 F.3d 241, 255 (2d Cir. 2006)).[8]  So even if there were a clear consensus of district court cases, that would not create clearly established law for purposes of this analysis.

In any event, the cases cited in *Wiggan* that concluded that the use of pepper spray was excessive, including *Tracy* and *Hogan*, are not factually analogous to this case.  That is because those cases did not address an unrestrained yet uncooperative inmate who was not physically threatening officers.  Ismael did not physically resist or threaten any of the officers before Camacho pepper sprayed him.  But he disobeyed multiple direct orders.  Plaintiff has not cited—and the Court has not unearthed—any case with similar facts, much less any Second Circuit or Supreme Court case.

---

[8] It is also true that there need not be a case directly on point for law to be clearly established "so long as preexisting law clearly foreshadows a particular ruling on [an] issue."  *Garcia v. Doe*, 779 F.3d 84, 92 (2d Cir. 2014) (quotation and brackets omitted).  So district court decisions might be relevant to the qualified immunity analysis if they signal that preexisting law Supreme Court or Second Circuit cases foreshadowed a ruling on an issue.  But district courts themselves can never create clearly established law.

Thus, even if Camacho violated Ismael's Eighth Amendment rights by pepper spraying him (an issue the Court does not decide), that right was not clearly established.

Camacho is also entitled to qualified immunity because a reasonable officer might have concluded that it was appropriate to pepper spray Ismael in the factual circumstances presented here.  And "[a]n officer is entitled to qualified immunity if any reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, could have determined that the challenged action was lawful." *Muschette*, 910 F.3d at 70 (quotation and emphases omitted).  Because Ismael was uncooperative and the officers may have needed to act quickly to respond to the institutional alarm, a reasonable officer may have concluded that it was lawful to pepper spray Ismael.  For those reasons, Camacho is entitled to summary judgment on Ismael's Section 1983 claim to the extent that claim turns on Camacho's use of pepper spray.[9]

### b. Failure to Intervene

Camacho is not entitled to qualified immunity on Ismael's failure to intervene theory of liability under Section 1983, however.  "[L]aw enforcement officials have an affirmative duty to intervene to protect against the infringement of constitutional rights from conduct committed by other officers in their presence." *Curley*, 268 F.3d at 72 (2d Cir. 2001) (citation omitted); *see also Sloley*, 945 F.3d at 46-47 (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)); *Randolph*, 2020 WL 2846649, at *2 (citing *Curley* in Eighth Amendment context).  "An officer who fails to intercede in the use of excessive force or another constitutional violation is liable for the preventable harm

---

[9] Ismael abandoned his battery claim against Camacho in his opposition.  *See* Opp. at 9 ("[P]laintiff has raised an issue of fact as to whether Camacho participated in the deprivation of his [E]ighth [A]mendment rights[.]").  In any case, the only possible factual predicate for the battery claim against Camacho is her use of pepper spray.  For the same reasons that Camacho's use of pepper spray cannot sustain an Eighth Amendment claim, it cannot serve as the basis for a battery claim.  So Defendants are entitled to summary judgment on Ismael's claim for battery against Camacho.

caused by the actions of other officers." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) (citation omitted); *see also Anderson*, 17 F.3d at 557.

Defendants again argue that Ismael did not plead that Camacho failed to intervene. No dice on that one. In his complaint, Ismael pleaded that Camacho was "present the entire time [he] was being beaten" before she told the corrections officers "[t]hat's enough." Compl. ¶ 40. That is adequate to plead a claim for failure to intervene.

True, Ismael did not plead a separate "failure to intervene" claim against Camacho. But he didn't have to because "[a] 'failure to intervene' cause of action does not itself state a separate constitutional violation." *Hickey v. City of New York*, No. 01-cv-6506 (GEL), 2004 WL 2724079, at *16 (S.D.N.Y. Nov. 29, 2004), *aff'd*, 173 F. App'x 893 (2d Cir. 2006) (Lynch, J.). Rather, failure to intervene is a theory of liability for Ismael's cause of action under Section 1983. *See Blake v. Race*, 487 F. Supp. 2d 187, 208 n.14 (E.D.N.Y. 2007) (distinguishing between a plaintiff's "primary theory of liability" that "the defendants were directly involved in the unconstitutional acts" and the plaintiff's "failure to intercede theory" and rejecting the defendants argument that the plaintiff "abandoned any claims for failure to intercede liability because he failed to address that issue in his opposition papers"); *see also Lebal v. Cent. Falls Det. Facility Corp.*, No. 13-cv-3923 (DF), 2019 WL 1447261, at *13 (S.D.N.Y. Mar. 15, 2019) ("To establish the requisite personal involvement [for a failure to intervene claim], a plaintiff may show either that the defendant official was directly involved in the excessive use of force itself, or that the defendant official failed to intervene to prevent such a use of force by another official actor."). Indeed, for failure to intervene, "[l]iability attaches on the theory that the officer, by failing to intervene, becomes a 'tacit collaborator' in the illegality." *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016) (citation omitted). Ismael adequately alleged a cause of action under Section 1983 on a failure to intervene theory against Camacho.

"Failure to intercede results in liability where an officer observes excessive force is being used or has reason to know that it will be." *Curley*, 268 F.3d at 72; *see also Vann v. Sudranski*, No. 16-cv-7367 (VB), 2020 WL 3001072, at *6 (S.D.N.Y. June 4, 2020) (quoting *Jean-Laurent v. Wilkerson*, 461 F. App'x 18, 21 (2d Cir. 2012)).  And "for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Vann*, 2020 WL 3001072, at *6 (quoting *Jean-Laurent*, 461 F. App'x at 21).  "Whether the officer had a 'realistic opportunity' to intervene is normally a question for the jury, unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Sloley*, 945 F.3d at 47 (citation omitted).  The plaintiff must also show that the officer did "not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988); *McLaurin v. New Rochelle Police Officers*, 373 F. Supp. 2d 385, 395 (S.D.N.Y. 2005)); *see also Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997).

In sum, to succeed on a failure to intervene claim, a plaintiff must show "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would [have] know[n] that the victim's constitutional rights were being violated; and (3) the officer d[id] not take reasonable steps to intervene." *Jean-Laurent*, 540 F. Supp. 2d at 512; *see also Pierce v. City of N.Y.*, 805 F. App'x 70, 72 (2d Cir. 2020) (quoting *Jean-Laurent*, 540 F. Supp. 2d at 512); *Holland v. City of N.Y.*, 197 F. Supp. 3d 529, 549 (S.D.N.Y. 2016) (quoting *Jean-Laurent*, 540 F. Supp. 2d at 512); *Bouche v. City of Mount Vernon*, No. 11-cv-5246 (SAS), 2012 WL 987592, at *5 (S.D.N.Y. Mar. 23, 2012) (quoting *Tavares v. City of New York*, No. 08-cv-3782 (JSR) (JCF), 2010 WL 234974, at *4 (S.D.N.Y. Jan. 19, 2010)).

Qualified immunity also applies to failure to intervene claims.  "To overcome the defense of qualified immunity for failure to intercede whe[n] others have engaged in excessive force, a plaintiff

24

must show that the failure to intercede permitted fellow officers to violate an individual's clearly

established rights of which a reasonable officer would have known[.]" *Allen v. City of New York*, 480

F. Supp. 2d 689, 695 (S.D.N.Y. 2007) (quotation omitted).  The "failure to intercede must" also "be

under circumstances making it objectively unreasonable for him to believe that his fellow officers'

conduct did not violate those rights." *Ricciuti*, 124 F.3d at 129; *see also Allen* 480 F. Supp. 2d at 695.

So "an officer is entitled to qualified immunity unless" it was "'objectively unreasonable for him to

believe that his fellow officers' conduct did not violate the plaintiff's rights.'"  *Holland*, 197 F. Supp.

3d at 549 (quoting *Ricciuti*, 124 F.3d at 129) (brackets omitted); *see also Yunus v. Jones*, No. 9:16-cv-

1282 (GTS) (ATB), 2019 WL 5196982, at *13 (N.D.N.Y. June 21, 2019), *report and recommendation*

*adopted*, 2019 WL 4010260 (N.D.N.Y. Aug. 26, 2019); *Speights v. City of New York*, No. 1:98-cv-4636

(NG) (JMA), 2001 WL 797982, at *6 (E.D.N.Y. June 18, 2001).  But on summary judgment, a

defendant must "show that *no* reasonable trier of fact could find that the defendants' actions were

objectively unreasonable." *Sims v. Griener*, No. 00-cv-2524 (LAP), 2001 WL 1142189, at *6

(S.D.N.Y. Sept. 27, 2001) (quotation omitted).

Camacho is not entitled to qualified immunity on Ismael's failure to intercede claim.  There

is a question of fact about whether the officers acted in an objectively unreasonable manner when

they subdued Camacho in the main intake.  For one, Ismael testified that the officers punched him

after he was handcuffed and shackled.[10]  According to Ismael, Camacho permitted this assault to

continue until she exclaimed "that's enough."  If a jury credited that testimony, it could conclude

that Camacho's failure to intervene was objectively unreasonable.  And as discussed, it was clearly

---

[10] Again, although there is video footage of the Main Intake Incident, it does not clearly contradict Ismael's testimony
that the corrections officers punched him after he was restrained.  The Court must thus accept Ismael's version of
events for purposes of this motion.

established that a use of force against a restrained inmate is unreasonable.  There is also a factual dispute about whether Camacho had a reasonable opportunity to intervene.  That is unsurprising because "[w]hether the officer had a 'realistic opportunity' to intervene is normally a question for the jury[.]"  *Sloley*, 945 F.3d at 47 (citation omitted).  So there are factual disputes that preclude the Court from granting summary judgment on Ismael's failure to intervene claim against Camacho.

## III. MOTION TO EXCLUDE TESTIMONY AND REPORT OF DR. GLUCK

### A. Legal Standard

Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "Rule 702 assigns to district courts the gatekeeper function—'ensuring that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'"  *Restivo v. Hessemann*, 846 F.3d 547, 575 (2d Cir. 2017) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993) (brackets omitted)).  A court must therefore make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  *Daubert*, 509 U.S. at 592-93.  The court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).  "*Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony

based on 'technical' and 'other specialized' knowledge." *Restivo*, 846 F.3d at 575 (quoting *Kumho Tire*, 526 U.S. at 141).

Courts applying Rule 702 engage in a "three-step inquiry." *Royal Park Invs. v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387, 394 (S.D.N.Y. 2018).  "The initial question" is "whether a witness is 'qualified as an expert by knowledge, skill, experience, training, or education' to render his or her opinions." *Nimely v. City of New York.*, 414 F.3d 381, 396 n.11 (2d Cir. 2005) (quoting Fed. R. Evid. 702).

If so, then the court must determine whether the expert's testimony is "relevan[t] and reliab[le.]" *Id.*; *see also Royal Park*, 324 F. Supp. 3d at 394.  To decide whether an expert's testimony is reliable, *Daubert* instructed courts to consider "the theory's testability, the extent to which it 'has been subjected to peer review and publication,' the extent to which a technique is subject to 'standards controlling the technique's operation,' the 'known or potential rate of error,' and the 'degree of acceptance' within the 'relevant scientific community.'" *United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015) (quoting *Daubert*, 509 U.S. at 593-94).  "But the inquiry is a 'flexible one,' and the 'factors *Daubert* mentions do *not* constitute a definitive checklist or test.'" *Restivo*, 846 F.3d at 575 (first quoting *Daubert*, 509 U.S. at 594 and then quoting *Kumho Tire*, 526 U.S. at 150) (alterations omitted).  "Whether some or all of these factors apply in a particular case depends on the facts, the expert's particular expertise, and the subject of his testimony." *In re Fosamax Products Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (citing *Kumho Tire*, 526 U.S. at 138).

"In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).  But "conclusions and methodology are not entirely

distinct from one another," and a district court is not required to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  "Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."  *Amorgianos*, 303 F.3d at 266.

To warrant admissibility, the "expert's analysis" must "be reliable at every step."  *Id.* at 267. "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.*  But evidence should only be excluded "if the flaw is large enough that the expert lacks good grounds for his or her conclusions." *Id.* (quotation omitted); *see also Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp. LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (holding that a "trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison" (quotation omitted).

In addition to being reliable, an expert's testimony must also be relevant.  So a court must "look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant" to "fulfill[] this gatekeeping role[.]"  *Amorgianos*, 303 F.3d at 265; *see also* Fed. R. Evid. 401 ("Evidence is relevant if:  (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

"Even after determining that a witness is 'qualified as an expert' to testify as to a particular matter and that the opinion is based upon reliable data and methodology, Rule 702 requires the

district court to make a third inquiry:  whether the expert's testimony (as to a particular matter) will 'assist the trier of fact.'"  *Nimely*, 414 F.3d at 397 (quoting former Fed. R. Evid. 702).[11]  This inquiry overlaps with—but is not the same as, *see id.* at 396 n.11—the inquiry into whether the evidence is relevant.  Indeed, "[w]eighing whether the expert testimony assists the trier of fact goes primarily to relevance."  *Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 375 (S.D.N.Y. 2014) (citing *Daubert*, 509 U.S. at 591).  Expert testimony that is "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help" should be excluded.  *United States v. Mulder*, 273 F.3d 91, 101 (2d Cir. 2001) (quoting *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991)).  "[E]xpert testimony that usurps either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it by definition does not aid the jury in making a decision[.]"  *Nimely*, 414 F.3d at 397 (quotation and brackets omitted).  So expert testimony that "tell[s] the jury what result to reach[] and thus attempts to substitute the expert's judgment for the jury's" is not admissible.  *Id.* (quotation omitted).

As with all other evidence, expert testimony is also "subject to Rule 403, and 'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'"  *Id.* (quoting Fed. R. Evid. 403).  In fact, Rule 403 plays "a uniquely important role" in "a district court's scrutiny of expert testimony[.]"  *Id.*  That is because a jury may give expert testimony "unique weight" in its "deliberations."  *Id.* (citing, among others, *Daubert*, 509 U.S. at 595).

"[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied[.]"  *United States v. Williams*,

---

[11] In 2011, Rule 702 was amended to change "assist" to "help."  That change was "intended to be stylistic only."  Advisory Committee Notes to the 2011 Amendment to Fed. R. Evid. 702.

506 F.3d 151, 160 (2d Cir. 2007).  But exclusion "of expert testimony is the exception rather than the rule."  *Floyd v. City of New York*, 861 F. Supp. 2d 274, 287 (S.D.N.Y. 2012) (quoting Advisory Committee Notes to the 2000 Amendment to Fed. R. Evid. 702); *see also WIZKIDS/NECA, LLC v. TIII Ventures, LLC*, No. 17-cv-2400 (RA), 2019 WL 1454666, at *4 (S.D.N.Y. Mar. 31, 2019). Indeed, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Amorgianos*, 303 F.3d at 267 (quoting *Daubert*, 509 U.S. at 596).  And "disputes as to the strength of [an expert's] credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005) (quotation omitted).  That rule tracks "the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to "opinion" testimony.'"  *FDIC v. Suna Assocs.*, 80 F.3d 681, 687 (2d Cir. 1996) (quoting *Daubert*, 509 U.S. at 588); *see also Nimely*, 414 F.3d at 395 ("Rule 702 embodies a liberal standard of admissibility for expert opinions[.]").

### B. Application

Ismael has met his burden to admit Gluck's report and testimony.  Gluck is a medical doctor and an orthopedic hand specialist.  Gluck Report at 5-6.  He is thus qualified to testify as an expert. And Defendants do not challenge his qualifications.

Gluck's testimony is also relevant and reliable.  Gluck examined Ismael and reviewed his medical records.  *Id.* at 2-3.  Based on his medical expertise and Ismael's symptoms, Gluck found that the altercation with the officers caused Ismael's wrist injuries.  "Courts have admitted expert testimony from medical doctors based on their examination and treatment of a patient's condition." *Figueroa v. Bos. Sci. Corp.*, 254 F. Supp. 2d 361, 366 (S.D.N.Y. 2003) (collecting cases).  Granted,

Gluck was not Ismael's' treating physician.  But that makes no difference here.  Gluck specializes in treating hands, and he applied his expertise to opine on the cause of Ismael's wrist injury.

Defendants argue that Gluck's opinions are not based on a reliable methodology.  Not true. Gluck applied his expertise as a hand doctor to opine on Ismael's wrist pain and other symptoms. "[T]his is not a case involving complex questions of medical causation, where it would be necessary to use sophisticated scientific theory or methods to determine the cause of injury." *Reyes v. Delta Dallas Alpha Corp.*, No. 92-cv-4418 (AGS), 2000 WL 526851, at *2 (S.D.N.Y. May 2, 2000).  As in *Reyes*, "[t]here is simply nothing in the record to lead the Court to doubt the doctor's methods in making a reasoned judgment as to cause." *Id.*

Defendants also argue that Gluck should have "conducted a meaningful 'differential diagnosis'" to "rul[e] out other possible contributing factors" for Ismael's injuries. *Matthews v. Hewlett-Packard Co.*, No. 15-cv-3922 (DAB), 2017 WL 6804075, at *2 (S.D.N.Y. Dec. 22, 2017) (quoting *Munafo v. Metro. Trasp. Auth.*, Nos. 98-cv-4572 (ERK), 00-cv-0134 (ERK), 2003 WL 21799913, at *18 (E.D.N.Y. Jan. 22, 2003)).  Gluck found that "[t]here is nothing in the medical records or history and physical examination to refute causality as related by the patient for the physical findings."  Gluck Report at 4.  So in Gluck's opinion, "[t]o a degree of medical certainty, the damage to Mr. Ismael's hand and wrist were caused by the injuries sustained" during the altercation in this case. *Id.*  While this is not exactly a robust analysis, it shows that Gluck did think about—and reject—alternative causes.

In any event, "[t]he testimony of doctors has also been admitted despite a failure to rule out alternative causes[.]" *Figueroa*, 254 F. Supp. 2d at 366.  That is because "[t]o the extent that physicians do not fully consider and rule out all possible causes, such deficiencies generally go to the weight of the evidence, not admissibility, and weighing the evidence is a function for the jury." *Id.*

(citing, among others, *McCullock*, 61 F.3d at 1043-44) (quotation omitted).  The question remains whether Dr. Gluck's opinion is reliable.  Ismael has met his burden to show that it is.

Gluck's testimony will also assist the jury.  As laypeople, the jury are not well-equipped to determine whether Ismael's altercation with the officers and the officers' subsequent actions—such as tightly handcuffing his wrists—might have caused his wrist injury.  This is precisely the sort of issue on which Gluck's testimony might assist the jury.  Defendants only argument on this point is that Gluck's testimony lacks a reliable methodology, so it would not help the trier of fact.  Because the Court has rejected that argument, it likewise rejects his argument that Gluck's report and testimony would not assist the trier of fact.

## IV. CONCLUSION

Defendants' motion for partial summary judgment is GRANTED in part and DENIED in part.  Defendants are entitled to summary judgment on Ismael's claims against Polite and against Camacho for use of pepper spray.  But the motion is denied as to all other claims because there are material factual disputes about the degree of force Sampson, Caruso, and Charles used, their intent in applying that force, and Camacho's ability to intervene.  Defendants motion to preclude Dr. Gluck's testimony and report is also DENIED because Ismael has met his burden to show that Gluck's testimony is relevant and reliable.

The Clerk of Court is directed to remove Deputy Warden Polite from the list of Defendants in this case and to terminate the motions pending at Dkt Nos. 49 and 53.

SO ORDERED.

Dated:  July 15, 2020

_____
GREGORY H. WOODS
United States District Judge